UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KEELON T. JENKINS,<br><br>      Petitioner,<br><br>  v.<br><br>MICHAEL S. EVANS, Warden,<br><br>      Respondent.<br>_____/ | No. C 05-02003 MHP<br><br>**MEMORANDUM & ORDER**<br><br>**Re:** Habeas Corpus Petition |

      Keelon Jenkins, a prisoner currently in custody at Folsom State Prison, filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. In his petition, Jenkins challenges his convictions for first degree murder, assault with a deadly weapon, and possession of a firearm under California Penal Code Sections 187, 245(a)(1), and 12021(a). *See* Docket No. 46 (Response to Order to Show Cause), Exh. 1 (Reporter's Transcript ("RT")) at 1298; *People v. Jenkins,* No. A095527, 2003 WL 22881662, at *1 (Cal. Ct. App. 2003). Jenkins alleges his imprisonment is unlawful for three reasons: (1) he received ineffective assistance of counsel in violation of the Sixth Amendment; (2) he was deprived of his constitutional rights of counsel and due process as a result of the Alameda Superior Court's refusal to hold a proper hearing on his motion to substitute counsel; and (3) he was deprived of the right to a fair trial and due process as a result of the prosecution's unlawful use of peremptory challenges. Having considered the arguments of the parties and for the reasons stated below, the Court enters the following memorandum and order.

BACKGROUND

This case arises from a "bungled" staged robbery of an armored Brink's truck on September 20, 1994 outside the Wells Fargo Bank in Berkeley, California. *People v. Jenkins,* No. A095527, 2003 WL 22881662, at *1 (Cal. Ct. App. 2003).

At trial, Jenkins testified that the idea of staging a robbery originated with a man named Frank Valentine, who offered Jenkins and his friend Robert McDaniels $20,000 to participate in the plan. Reporter's Transcript at 1998. Valentine told Jenkins that two men would be present at the Brinks truck: a guard and a driver. *Id.* The guard would be a cooperating insider, and Jenkins was supposed to approach the guard at the back of the truck, disarm him, and then take the money. *Id.* at 2061. However, things did not go as planned, and when Jenkins approached the guard, the guard backed away and reached for his gun, proceeding to shoot in Jenkins' direction. *Id.* at 2078. Jenkins fled, but fired multiple shots toward the cab of the Brink's truck. *Id.* One of these shots hit and killed the driver, Jeffery Spencer. *Id.* Jenkins, along with McDaniels, got into a getaway car and fled the scene. *Id.* Jenkins confessed to the shooting, but claimed that he did not intend to rob the guard, due to his purported status as a cooperating insider. *Id.*

On September 30, 1997, Jenkins and McDaniels were tried before a jury in Alameda County Superior Court and convicted of first degree murder, attempted robbery with a "special circumstances" enhancement, and possession of a firearm. *Jenkins,* 2003 WL 22881662, at *1. Both men appealed to the California Court of Appeal for the First Appellate District, which overturned their convictions on the grounds that the guilty verdicts were coerced by comments made by the trial court. *Id.*

Jenkins was granted a second jury trial in 2001. During voir dire for this trial, William DuBois, Jenkins' attorney, filed three successive *Wheeler* motions (the state law equivalent to a *Batson* motion). *See People v. Wheeler*, 22 Cal. 3d 258 (1978); *Batson v. Kentucky*, 476 U.S. 79 (1986); Response to Order to Show Cause, Exh. 3 (Augmented Reporter's Transcript ("ART")) at 452. These motions alleged that the prosecution improperly used its peremptory challenges to eliminate seven out of ten African-American prospective jurors. ART at 452. After the jury was

2

empaneled, the trial court held a hearing on the *Wheeler/Batson* motion and first found a prima facie case of racial discrimination. The prosecutor then asserted his justifications for challenging each of the African-Americans, and the trial court denied the motion. *Id.* at 336-43.

In addition to the *Wheeler/Batson* motions, Jenkins made two *Marsden* motions for substitution of counsel, citing disagreements between himself and his attorney over trial strategy. *See People v. Marsden,* 2 Cal. 3d 118, 122 (1970). Jenkins requested an initial *Marsden* hearing on July 18, 2000, claiming the disagreements between himself and trial counsel were so fundamental that they would prevent DuBois from "giving him adequate assistance." *Jenkins*, 2003 WL 22881662, at *2. The trial court held a hearing, during which Jenkins explained that the two disagreed over who had orchestrated the plan to rob the Brink's truck and that Jenkins feared this disagreement would prevent him from getting an adequate defense. *Id.* The court denied the substitution on July 18, 2000. *Id.* Jenkins presented a second *Marsden* motion on February 21, 2001, the day before opening statements at trial were scheduled. *Id.* In his opening statements and through questioning of witnesses, trial counsel planned to argue that a man named Anthony Young was the mastermind behind the crime.[1] RT at 351. In his own testimony, however, Jenkins planned to allege that the aforementioned Frank Valentine was actually responsible for the plan. *Id.* Jenkins argued that this dispute over defense strategies was fundamental enough to constitute ineffective assistance of counsel, and that he should be entitled to a second hearing regarding substitution of counsel as a result. *Id.* The court denied Jenkins a second *Marsden* hearing on February 21, 2001, finding the request to be untimely. *Jenkins,* 2003 WL 22881662, at *2.

At the close of the trial, Jenkins was convicted of first-degree murder, assault with a deadly weapon, and possession of a firearm. Reporter's Transcript at 1298. He was sentenced to life in prison without the possibility of parole. *Jenkins,* 2003 WL 22881662, at *1. McDaniels was convicted of first-degree murder, and was sentenced to a term of twenty-five years to life. *Jenkins,* 2003 WL 22881662, at *1.

Jenkins appealed this second conviction to the California Court of Appeal, claiming the prosecution had acted in a discriminatory manner when selecting the jury, and that the trial court had

3

erred by denying the *Wheeler*/*Batson* motions. *Id.* In addition, Jenkins challenged the trial court's denial of his motion for substitute appointed counsel. *Id.* This appeal was denied in November 2003, and Jenkins filed a petition for review in the California Supreme Court, which was denied the following year. Response to Order to Show Cause, Exh. 10.

In February 2005, Jenkins filed a habeas petition in the California Court of Appeal, alleging ineffective assistance of counsel, prejudicial jury instructions, and the jury's failure to set a verdict on the special circumstances enhancement in compliance with due process. The petition was denied without an opinion two days later. He then filed a second petition in the California Supreme Court, which was subsequently denied on February 22, 2006. Response to Order to Show Cause, Exh. 11 (Denial of Certiorari). While his habeas petition was still pending in state court, Jenkins filed a habeas petition with this court. Docket No. 1, Petition at 1. At Jenkins' request, this court stayed the action so the petitioner could exhaust his claims in the state courts. *See* Docket No. 6 (Order Granting Stay).

In December 2009, this court found three of Jenkins' eight original claims for relief to be cognizable: ineffective assistance of counsel, denial of a hearing for the *Marsden* motion, and the *Wheeler/Batson* challenge. This court ordered respondent to show cause as to why the writ of habeas corpus should not be granted, and respondent filed an answer on May 17, 2010. Docket No. 45 (Order Denying Motion for Joinder); Response to Order to Show Cause. In response, the petitioner filed a traverse on August 13, 2010. Docket No. 56.

LEGAL STANDARD

This court may entertain a petition for writ of habeas corpus "on behalf of a person in custody pursuant to the judgment of a state court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of

the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. A "federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Id.* at 409. This requires a reviewing court to analyze the last reasoned opinion entered in the case.

In cases where the state court has not supplied the reasoning for its decision, an independent review of the record is required to determine whether the state court clearly erred in its application of controlling federal law." *Greene v. Lambert*, 288 F.3d 1081, 1089 (9th Cir. 2002). "Federal habeas review is not de novo when the state court does not supply reasoning for its decision, but an independent review of the record is required to determine whether the state court clearly erred in its application of controlling federal law." *Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000). While the Court is "not required to defer to a state court's decision when that court gives us nothing to defer to, [the Court] must still focus primarily on Supreme Court cases in deciding whether the state court's resolution of the case constituted an unreasonable application of clearly established federal law." *Fisher v Roe*, 263 F.3d 906, 914 (9th Cir. 2001).

5

DISCUSSION

I.   Ineffective Assistance of Counsel

Petitioner alleges he was denied the effective assistance of counsel guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution. To prevail on an ineffective assistance of counsel claim, a petitioner must show that (1) "counsel's representation fell below an objective standard of reasonableness under prevailing professional norms," and (2) "counsel's deficient performance resulted in prejudice" and affected the outcome of the proceeding. *Strickland v. Washington,* 466 U.S. 668, 686 (1984). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694. The relevant inquiry under *Strickland* does not focus on what the defense counsel could have done, but whether his choices were reasonable. *Id.* at 688. Consequently, "judicial scrutiny of counsel's performance must be highly deferential," and "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id*. at 689. Failure to satisfy either the performance or prejudice prong defeats an ineffectiveness claim. *Id.* The court may address these prongs in whichever order is most expedient. *Id.*

Jenkins argues that his trial counsel, William DuBois, provided ineffective assistance of counsel. Jenkins contends that trial counsel's performance was prejudicial for two related reasons: (1) Jenkins and DuBois each presented different theories as to who orchestrated the crime, and (2) DuBois' statements to the jury regarding their disagreement served to undermine Jenkins' credibility. The court, for the reasons set forth below, concludes that any error by Dubois was not prejudicial.[2]

A.   Inconsistent Defense Strategy

Jenkins argues that by representing to the jury that Young was the mastermind of the robbery, despite Jenkins' insistence that Valentine was the true mastermind, DuBois' conduct was prejudicial under *Strickland*.

6

The *Strickland* prejudice prong can be met in one of two ways: constructive denial of counsel, which is prejudicial per se, or a showing of a reasonable probability that counsel's poor performance prejudiced the defense. *Schell v. Witek,* 218 F.3d 1017, 1028 (9th Cir. 2000).

Petitioner failed to show constructive denial of counsel. In the Ninth Circuit, constructive denial of counsel has been defined as a total lack of communication preventing an adequate defense. *Plumlee v. Masto*, 512 F.3d 1204, 1210 (9th Cir. 2006). However, not every difference over trial strategy creates an irreconcilable conflict. A "lawyer may properly make a tactical determination of how to run a trial even in the face of his client's incomprehension or even explicit disapproval." *Cooley v. Campbell,* No. S050870, 2009 WL 2407703, at *13 (E.D. Cal. 2009); *Fluker v. Hartley,* No. 09-1052, 2010 WL 1678234 (C.D. Cal. 2010) (quoting *Brookhart v. Janis*, 384 U.S. 1, 8 (1966) (Harlan, J., dissenting in part)).

Here, the conflict between DuBois and Jenkins did not rise to the level of constructive denial of counsel. While Jenkins and DuBois were "not seeing eye to eye" and wanted to pursue different legal strategies, the Court of Appeal "noted they had been conversing together the day before," indicating relations between the two men had not deteriorated into a total lack of communication. *Jenkins*, 2003 WL 22881662, at *5. A mutual dislike or disagreement between the defendant and trial counsel is insufficient to show constructive denial of counsel. *Plumlee*, 512 F.3d at 1209 (observing that there is no Supreme Court case "that stands for the proposition that the Sixth Amendment is violated when a defendant is represented by a lawyer free of actual conflicts of interest, but whom the defendant refuses to cooperate with because of dislike or distrust.").

Because constructive denial of counsel did not occur, to prove prejudice, there must be a showing of a "reasonable probability that but for counsel's objectively unreasonable performance, the outcome of the proceeding would have been different." *Gonzalez v. Knowles*, 515 F.3d 1006, 1014 (9th Cir. 2008). Jenkins alleges that DuBois' performance in the trial was prejudicial because his "unprofessional errors undermine[d] confidence in the outcome." Docket No. 37 (Third Amended Petition for Writ of Habeas Corpus) at 16. Jenkins argues that he went ahead with the "staged" robbery in part because he feared retribution from Valentine if he refused, putting forth

7

what appears to be a theory of duress. Accordingly, he insists that he lacked the intent to *rob* the Brinks guard, believing he was a cooperating insider. Jenkins, however, fails to explain precisely how DuBois' competing theory regarding Anthony Young affected the result of the second trial. Although in the first trial the prosecution put forth a theory of first degree felony murder predicated on a robbery offense, Jenkins was convicted of standard first-degree murder in the second trial, not felony murder. RT at 1298. Jenkins' arguments regarding the *mens rea* for robbery are therefore inapposite.[3]

### B.    Questioning of Credibility

Petitioner further contends that trial counsel acted ineffectively by explicitly attacking his client's credibility during the course of trial. DuBois arguably called his client a liar, stating: "if you think I believe everything [Jenkins] said, you already know the answer to that. . . I've had disagreements with my client for years" about who the mastermind behind the crime was. Reporter's Transcript at 2679. Petitioner argues that these statements constitute per se ineffective assistance of counsel, and therefore no further analysis is needed. In support of this proposition, he cites to *United States v. Swanson,* 943 F.2d 1070, 1075 (9th Cir. 1991), which held that a trial lawyer's closing argument, in which he conceded his client's guilt, was ineffective assistance per se. In *Swanson,* the defendant was charged with bank robbery, and the defense rested without calling any witnesses. *Id.* The Ninth Circuit held that when a "defense attorney concedes that there is no reasonable doubt concerning the only factual issues in dispute, the government has not been held to its burden of persuading the jury that the defendant is guilty," and therefore, found ineffective assistance of counsel. *Id.* at 1073. The attorney conduct in *Swanson*, however, is distinguishable from DuBois' conduct. Swanson's counsel went beyond attacking his client's credibility and for all practical purposes, "ceased to function as defense counsel." *Id.* Here, even if DuBois did not believe Jenkins' claims that Valentine was the mastermind behind the crime, he still persisted with a reasonable defense for his client by arguing that another third-party orchestrated the crime. In doing so, he continued to function as defense counsel in a manner that was not prejudicial per se.

8

Jenkins has not alternatively established a reasonable probability that DuBois' conduct altered the outcome of the case. DuBois may have implied he didn't believe his client's testimony, but he did not go so far as to concede his client's guilt, and otherwise advocated his client's position zealously, so much so that the jury found itself deliberating for weeks about the outcome of the case. Similarly, in *Yarborough v. Gentry*, the Supreme Court held that a trial attorney had not performed deficiently, even though he had attacked his client's credibility. 540 U.S. 1, 11 (2003). Although Gentry's counsel "implied that even he did not believe" his client's testimony, the Court still concluded his representation was adequate. As here, mentioning his client's failings was not unduly prejudicial, and in fact, might have led the jury to focus on the issues at play in the case, rather than the client's character. *Id.*

Courts have generally found credibility attacks to be unduly prejudicial in cases where the attorney's failings were significantly more numerous and varied than at issue here. *Harris By and Through Ramseyer v. Wood,* 64 F.3d 1432, 1440 (9th Cir. 1995). In *Harris*, defense counsel attacked Harris' credibility by attacking his character, citing his promiscuous behavior, alcoholism and lack of moral code. *Id.* However, Harris' attorney prejudicial performance went far beyond simple credibility attacks. In addition, defense counsel failed to do the following: (1) investigate and prepare adequately for trial, (2) consult adequately with his client, (3) challenge the admissibility of certain statements, (4) conduct proper voir dire, (5) object to evidence and propose jury instructions, and (6) raise or preserve meritorious issues in appellate proceedings. *Id.* The Seventh and Fourth Circuits have declined to find ineffective assistance of counsel in situations where the defense attorney merely conceded his client's guilt. *Young v. Catoe,* 205 F.3d 750, 759-62 (4th Cir. 2000), cert denied, 531 U.S. 868 (2000); *United States.v. Allison,* 59 F.3d 625. 629-30 (7th Cir. 1995).

For the foregoing reasons, the state court reasonably found that Jenkins was not denied effective assistance of counsel.

9

II.     Motion for Substitution of Counsel

Jenkins argues that the trial court unconstitutionally denied him a hearing by failing to inquire as to the disagreement between Jenkins and his attorney. According to Jenkins, this conflict prevented him from receiving adequate representation, and thus violated his Sixth Amendment rights.

The Court of Appeal reasonably concluded Jenkins' constitutional rights were not violated because he was given adequate opportunity to air his grievances. The right to discharge counsel is not absolute. *Schell*, 218 F.3d at 1024. To properly consider a motion for substitution of counsel, the court need only conduct an "inquiry adequate to create a sufficient basis for reaching an informed decision." *United States v. Musa,* 220 F.3d 1096, 1102 (9th Cir. 2000). This inquiry must only be as comprehensive as circumstances reasonably require. *King v. Rowland*, 977 F.2d 1354, 1357 (9th Cir. 1999). In cases where the trial judge was familiar with the conflict, "an extensive inquiry" is "unnecessary." *Id.*

Although Jenkins was not provided with an in camera hearing in February 2001, he was still given the opportunity to explain his situation to the trial court judge. Jenkins alleged that this opportunity was inadequate, but the California Court of Appeal found otherwise, holding that "the court heard Jenkins' objections, and they were patently groundless." *Jenkins,* 2003 WL 22881662, at *5. The trial court was aware that DuBois and Jenkins had worked together on the previous trial and that the two were generally able to communicate with one another. The trial court reasonably concluded that DuBois was too "far into the case and too well informed for a change of counsel," and that substitution would only prejudice Jenkins. *Jenkins,* 2003 WL 22881662, at *5; *see Bland v. Cal. Dept. of Corrections,* 20 F.3d 1469, 1476 (9th Cir. 1994), overruled on other grounds by *Schell*, 218 F.3d at 1017 (finding that a request for substitution of counsel made on the "eve of trial" which would require a postponement of the trial is not timely). Moreover, the trial court had held a *Marsden* hearing, which involved similar strategic disagreements between Jenkins and DuBois. As a result, the Court of Appeal reasonably concluded that the trial court's inquiry into Jenkins' second *Marsden* motion was constitutionally sufficient.

III.     *Batson* Challenges

The Court of Appeal reasonably determined that the trial court did not violate Jenkins' right to an unbiased jury. Jenkins alleges that the prosecution's invidious discrimination in selecting the jury, as well as the state's failure to provide a complete record of jury selection, violated his constitutional rights as set forth in *Batson v. Kentucky*, 476 U.S. 79, 133 (1986). In *Batson,* the United States Supreme Court held that excluding jurors based on race violated the Equal Protection Clause of the Fourteenth Amendment. *Id.* Here, seven of ten African-Americans were eliminated from the jury, and African-Americans were struck at a significantly higher rate than members of any other race.[4]

If a defendant in a criminal matter challenges the use of peremptory strikes against racial minorities, trial courts must follow the analysis set forth in *Batson* and its progeny. *Id.* Under *Batson,* the courts have adopted a three step approach to determine whether the peremptory strike usage was permissible. *Green v. Lamarque*, 532 F.3d 1029-30 (9th Cir. 2008) (citing *Batson*, 476 U.S. at 106). The defendant must first make a prima facie showing that the challenge was based on an impermissible ground, such as race. *Batson,* 476 U.S. at 98. Secondly, if the trial court concludes "the defendant has made a prima facie case of discrimination, the burden then shifts to the prosecution to offer a race-neutral reason for the challenge that relates to the case." *Id*. Finally, if the prosecutor offers a race-neutral explanation, the trial court must decide whether the defendant has proved the prosecutor's motive for the strike was purposeful racial discrimination. *Id.*

When evaluating a *Batson* challenge, this court must undertake a "sensitive inquiry into such circumstantial and direct evidence of intent as may be available." 476 U.S. at 98. However, because the race neutral explanations for peremptory challenges are often based on subjective interpretations, there is "seldom much evidence" and the "best evidence often will be the demeanor of the attorney who exercises the challenge." *Hernandez v. New York*, 500 U.S. 352, 362 (1991). Since these "determinations of credibility" lie "peculiarly within the trial judge's province," in the "absence of exceptional circumstances," the reviewing court defers to the trial court. *Snyder v. Louisiana,* 552 U.S. 472, 477 (2008).

Here, the Court of Appeal's analysis satisfied its requirement to properly apply *Batson*. The Court of Appeal reasonably determined, as it was required to do under the third step in the *Batson* test, that the prosecutor's proffered reasons for using peremptory challenges to strike jurors were based on race-neutral reasons and were genuine. The prosecution explained that one of the jurors was a victim of police brutality and did not trust the police, a second did not appear to understand the proceedings, a third had an out of court interaction with the prosecution that left the prosecutor uncomfortable, a fourth believed she attended school with Mr. Jenkins, a fifth could not focus on the case because of problems at home and work, and the final two seemed sympathetic toward the defendant because of their own experiences. *See* Response to Order to Show Cause at 13-15. The record supports the state court's conclusion that the bases for challenge offered by the prosecution were legitimate, nondiscriminatory, and genuine. See *Batson*, 476 U.S. at 98.

CONCLUSION

The petition for writ of habeas corpus is hereby DENIED.

IT IS SO ORDERED.

Dated: November 12, 2010

MARILYN HALL PATEL
United States District Court Judge
Northern District of California

## **ENDNOTES**

1. Anthony Young and Frank Valentine were both mid-level criminals operating in the defendant's neighborhood. Frank Valentine was dead at the time of the trial, and DuBois stated during the trial that Jenkins could have accused Valentine instead of Young because he feared retaliation. *See* Response to Order to Show Cause, Exh. 2 at 1620, 1683-1684.

2. Accordingly, the court does not address whether DuBois' conduct was objectively unreasonable under the *Strickland* analysis.

3. Moreover, the evidence seems to support a conclusion that Jenkin was not under duress. Jenkins testified that Valentine stopped him on a street corner and asked him if he wanted to make $20,000, and then explained the robbery plan in detail. Reporter's Transcript at 2045. He stated that once he agreed to the plan, he "felt obligated" and feared that Valentine would kill him, but can point to no specific threats made by Valentine. Jenkins specifically states, "basically we was obligated [sic], and plus at the same time, you know, $20,000 is a lot of money, so that sounded good too." *Id.* at 2048.

4. African-Americans were struck at a rate of 70%, compared with only 30% for all other races. The actual jury consisted of five Caucasian females, three African-American males, two Asian men, one Asian woman, one Mexican man, and three jurors who did not self-identify.